EDMUND G. BROWN JR.
Attorney General of California
MICHAEL W. JORGENSON
Supervising Deputy Attorney General
MARISA Y. KIRSCHENBAUER
Deputy Attorney General
State Bar No. 226729
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 703-1380
  Fax: (415) 703-5843
  E-mail: Marisa.Kirschenbauer@doj.ca.gov
*Attorneys for Defendants C. Perea, N. Banks, M.D.,
S. Garrigan, M.D., E. Tootell, and R. Sweeny*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BRYAN ANTHONY DOUGLAS,<br><br>                     Plaintiff,<br><br>v.<br><br>WARDEN, SAN QUENTIN STATE PRISON,<br><br>                    Defendants. | C 09-3191 LHK<br><br>**DECLARATION OF E. TOOTELL, M.D. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:     The Honorable Lucy H. Koh<br>Action Filed:   July 14, 2009 |

I, E. TOOTELL, M.D., declare as follows:

1. I am the Chief Medical Executive for San Quentin State Prison (San Quentin). I first worked as a UCSF consultant for the California Department of Corrections and Rehabilitation (CDCR) from 2005 to 2007. I then worked as the Regional Medical Director-Central as a contractor from 2007 to 2008. In 2008, I was hired as the Chief Medical Officer; the position was changed to Chief Medical Executive in 2009. My primary duty as Chief Medical Executive is the supervision of inmate medical care at San Quentin. I have been licensed to practice medicine in the State of California since 2004. I am competent to testify to the matters set forth in this declaration, and if called upon to do so, I would and could so testify. I submit this

1

1 declaration in support of Defendants' motion for summary judgment.

2. CDCR's policy on Outpatient Therapeutic Diets, Nourishment and Supplements can be found in Chapter 20 of the Division of Correctional Health Care Services policy. Section VIII addresses CDCR's policy on food allergies, and provides that an inmate's primary care physician (PCP) shall evaluate inmate-patients who request a special diet due to claimed food allergy. If the PCP determines the inmate-patient has a food allergy, the PCP will determine if the allergy can be appropriately managed by educating and training the inmate to avoid the identified food, or if a chrono ordering a food substitution is required. A true and correct copy of Chapter 20 of the Division of Correctional Health Care Services policy, Section VIII (Food Allergies) is attached as Exhibit A.

3. I have reviewed San Quentin's medical records for inmate Bryan Anthony Douglas (Douglas), CDCR No. G44753. Inmate medical records are kept in the course of regularly conducted business activity and every effort is made to maintain the accuracy and integrity of each record. I am also familiar with the facts of this case and Douglas's claims.

4. A food allergy is treated as a special diet rather than a medical diet, which is provided to diabetic or gluten-free meal recipients. If an inmate has a food allergy, chronos may be given to an inmate to exclude foods they are allergic to from their diet. However, it is the inmate's responsibility to identify and avoid the foods he or she is allergic to.

5. Although I am informed that Douglas had an allergy attack while at San Quentin in January 2009, I was first notified of Douglas's food allergy on February 5, 2009. After I was informed of Douglas's allergy and request for a special diet, I called Douglas on February 6, 2009. A true and correct copy of notes from the February 6, 2009 telephone call with Douglas is attached as Exhibit B.

6. During my call with Douglas, he informed me that he ate breaded chicken and the breading contained nut products, which he was allergic to. He informed me that he was also allergic to fish.

7. An epi-pen is a medical device used to deliver a measured dose of epinephrine (also known as adrenaline) using autoinjector technology, most frequently for the treatment of acute

2

Decl. E. Tootell, M.D. Supp. Defs.' Mot. Summ. J (C 09-3191 LHK)

allergic reactions to avoid or treat the onset of anaphylactic shock. Douglas was previously given an epi-pen to keep on him and he informed me that he knew how to use it. A true and correct copy of the chrono regarding the epi-pen is attached as Exhibit C.

8. Douglas informed me that he had difficulty receiving protein substitutions whenever fish or nut products were served at San Quentin. He claimed that, whenever he told the correctional officers that he is allergic to the fish or nut products, the officers would remove the food item, but would not replace it.

9. I informed Douglas that I would discuss the ability of Food Services to accommodate Douglas's diet and to provide sufficient protein sources. I also informed Douglas that I would discuss possible housing options for him. At that time, there was a delay for housing in medical facilities, and it was unclear whether Douglas would require an in-patient bed simply to provide him with a nut and fish-free diet. However, I informed Douglas that his safety would be assured under any circumstances.

10. Douglas had previously been provided a chrono from Dr. Wu, indicating that Douglas should avoid eating fish and nut items. I also prepared a chrono for Douglas, indicating that he should avoid eating fish and nut products. A true and correct copy of the Comprehensive Accommodation Chrono that I prepared is attached as Exhibit D.

11. After talking with Douglas on February 6, I followed up with prison staff to determine if Douglas was receiving the proper food substitutions when fish and nut products were served. Specifically, I contacted N. Taylor, Custody Captain of Central Services, and Kelly Mitchell, Food Services Manager, regarding Douglas's claim that his chrono was not being honored by prison staff.

12. N. Taylor informed me that the food services staff was aware of Douglas's food allergy, and that trays were pre-made for Douglas for his breakfast and dinner. A special bag lunch was also being prepared for Douglas to meet his dietary needs. It was Douglas's responsibility to knock on the window when he arrived in the dining hall and show the staff the chrono so that his specially prepared food would be given to him. However, I was informed that Douglas was not asking for his specially-prepared trays or his lunch box. A true and correct

3

Decl. E. Tootell, M.D. Supp. Defs.' Mot. Summ. J (C 09-3191 LHK)

1  copy of the e-mail I received from N. Taylor is attached as Exhibit E.

2  13. I also discussed Douglas's case with Cora Perea, the dietician for San Quentin. Ms. Perea had interviewed Douglas and recommended protein substitutions for Douglas on the days that fish or nut products were served. However, even if Douglas did not receive a protein substitution on a day that fish or nut products were served, extra calories and extra protein are included in all meals for inmates, so avoiding foods that Douglas is allergic to would still provide adequate nutrition for Douglas's health maintenance.

14. Douglas did not have another allergy attack relating to fish and nut products while he was housed at San Quentin.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June __, 2011, at SQ, California.

E. Tootell, M.D.
Chief Medical Executive for San Quentin State Prison

SF2010400919
20460200.doc

4